Hancock, Jr., J.
(dissenting). The court today holds that a measure which establishes a detailed process aimed at splitting New York City into two separate cities — while depriving four of its five boroughs from any voice in the process — does not affect its property, affairs or government. I cannot agree.
In concluding that chapter 773* does not violate the home rule provisions of the State Constitution, the court rejects the argument that the legislation can be upheld as merely advisory or preliminary.[1]
[2] It does not adopt the rationale of the courts below for upholding the measure — that because the legislation is a matter of State concern, constitutional home rule compliance is unnecessary. Indeed, the court pointedly abstains from addressing that contention.
*488 Instead, it offers as the sole reason for its affirmance the contention that there is no "interference in New York City property, affairs, or government” (majority opn, at 485) — a reason not embraced by the courts below or affirmatively advanced by the parties. But a simple reading of chapter 773 reveals that the process intrudes deeply into city affairs and has a direct and immediate impact on the personnel, finances and administration of the city. For this reason, and because the subject matter of the statute is essentially of local — not State — concern (see, e.g., Wambat Realty Corp. v State of New York, 41 NY2d 490, 494), a home rule message was mandated under NY Constitution, article IX, §2 (b) (2). There was no such message and the legislation, therefore, is invalid.
Realistically, no subject more directly concerns the affairs and government of a city than whether the integrity of its boundaries and of its existing governmental structure should be altered. There can be no question that chapter 773 sets in motion a process that has one purpose: to disengage Staten Island from New York City and establish it as a separate and independent City of Staten Island.[3] Thus, with good reason the court concludes — as did the Appellate Division majority — that the legislation is "more than 'advisory only,’ and is surely ripe for review” (majority opn, at 485). That the voters have not yet approved the referendum does not affect this conclusion. The constitutional invalidity of the referendum — coupled with the inadequacy of a postelection determination of that constitutional issue in preventing the threatened harm — makes the question before us clearly justiciable (see, Matter of Fossella v Dinkins, 66 NY2d 162, 166-167; see also, Matter of Cantrell v Hayduk, 45 NY2d 925, 926; Matter of McCabe v Voorhis, 243 NY 401, 412-413).
The charter commission — the statute’s guiding component— *489 is not a study group charged with investigating and reporting on the advisability of secession; it is the official body created by the Legislature for the purpose of directing the continuing process toward secession. It must support secession, hold hearings, do research, gather information and draft the complex bill that will be necessary to effectuate it. (See, ch 773, § 4 [e], as amended [mandating that within "three months of adoption of the charter by the voters of Staten Island, the commission shall submit * * * proposed legislation enabling the borough of Staten Island to disengage and separate from the city of New York” (emphasis added)].)
All 13 members of the charter commission must come from Staten Island. Each of the five Staten Island legislators, all of whom are on record as favoring the legislation, is automatically a member of the commission. Each legislator is empowered to appoint one member to the commission. The three other commission members — also Staten Island residents — are to be appointed by the Governor, the temporary President of the Senate and the Speaker of the Assembly. The commission members are to be reimbursed by the State for their actual and necessary expenses.
The commission is vested with broad powers and prerogatives for carrying out its function. It may employ and set the compensation for such employees and consultants as it shall require. It is empowered to conduct private hearings, take testimony, subpoena witnesses and require the production of books, papers and records. Significantly, the commission may demand from any State or city department or bureau, commission, office, agency or other instrumentality such facilities, assistance, data and personnel as may be necessary or desirable for the proper execution of its powers and duties (ch 773, § 6 [e]). It must establish advisory committees on the creation of school districts for Staten Island, on civil service rights and retirement benefits for city employees who will become employees of the Staten Island municipal government, and on the various tax and financial problems that will arise.
There can be no doubt that — irrespective of the ultimate possibility of secession — the very pendency of the process and the activities of the commission will have, at least, the following immediate effects:
Uncertainty and Confusion — by creating this secession-aimed legislation, the future makeup of the city’s legislative body, and the configurations of its civil service system, its *490 school system, pension and retirement funds, its entire public debt structure, and its solid waste disposal scheme are put in question. This widespread uncertainty necessarily impairs effective present-day city planning for the future in several governmental areas.
Conscription of Resources and Personnel — from the very beginning of this multiyear process, the city’s resources and personnel are affected. The referendum to poll Staten Island’s interest in secession is to be supervised by the city Board of Election. The Board must prepare the ballots, canvass the results and certify the results to the Senate and Assembly (ch 773, § 2). Although the city’s expenditures are to be reimbursed by the State (§ 3), the city must initially lay out its money, assign its personnel, detail its expenses, and submit them to the State, subject to audit by the Comptroller. Finally and most significantly, the unbridled authorization vested in the commission to "request and receive from any * * * city * * * agency or other instrumentality such facilities, assistance, data and personnel as may be necessary or desirable [to the commission]” (§ 6 [e] [emphasis added]) amounts to an open-ended license for commandeering virtually every agency of city government.
Resultant Costs to the City — that there are direct and indirect costs to the city incident to its compliance with section 6 (e)’s command to assist the charter commission is self-evident. Notably, no provision is made for State reimbursement of these costs. Beyond that, to protect its vital interests, the city — because it is excluded from any participation in the commission’s proceedings — must now create and fund a parallel process in preparation for evaluating and reacting to any Staten Island secession bill emanating from the chapter 773 process.
Once the effect on city affairs, property or government is demonstrated, as it is here, a special act can be passed without a home rule message only where a concern exists "of sufficient importance to the State, transcendent of local or parochial interests” (Wambat Realty Corp. v State of New York, 41 NY2d 490, 494, supra). The court’s holding that chapter 773 was properly passed without a home rule message (art IX, § 2 [b] [2]) in the absence of a showing of such State concern contradicts prevailing authority (see, Matter of Town of Islip v Cuomo, 64 NY2d 50, 56-57; Matter of Kelley v McGee, 57 NY2d 522, 538; Wambat Realty Corp. v State of New York, 41 NY2d 490, 494-495, supra; Baldwin v City of *491 Buffalo, 6 NY2d 168, 172-174; New York Steam Corp. v City of New York, 268 NY 137, 143) and ignores the significant enlargement of municipal home rule protections given to municipalities in the new reformatted local governments provisions of article IX, adopted on January 1,1964.[4] (See, Kamhi v Town of Yorktown, 74 NY2d 423, 428-429.)
Without citing to any relevant authority and without addressing the substantial burdens imposed on broad areas of New York City government, the court simply announces that it discerns "no State interference” in city affairs. Significantly, it does not hold that chapter 773 is "of sufficient importance to the State, transcendent of local or parochial interests” (Wambat Realty Corp. v State of New York, 41 NY2d 490, 494, supra). Indeed, it never reaches this issue. With no showing of a perceptible State interest, chapter 773 is before us as a measure that is quintessentially local in its effect. Under these circumstances, there can be no question that under governing case law (see, Matter of Town of Islip v Cuomo, supra; Matter of Kelley v McGee, supra; Wambat Realty Corp. v State of New York, supra), a home rule message was mandated by article IX, § 2 (b) (2).
In conclusion, one might well ask: what will "affect” the property, affairs or government of an existing city so as to necessitate home rule compliance, if a statute having the invasive characteristics of chapter 773 does not, even though it establishes a process aimed at the city’s very dissolution? The court’s remarkable holding that such compliance is not called for gives unwelcome credence to the gloom expressed by one commentator for the future of home rule in New York (see, Cole, Constitutional Home Rule in New York: "The Ghost of Home Rule”, 59 St John’s L Rev 713, 749 [1985]). The words of Chief Judge Cardozo — written more than six decades ago— now seem all too prescient: "Home Rule for cities, adopted by the people with much ado and after many years of agitation, will be another Statute of Uses, a form of words and little else, *492 if the courts in applying the new tests shall ignore the new spirit that dictated their adoption. The municipality is to be protected in its autonomy against the inroads of evasion.” (Matter of Mayor of City of N. Y. [Elm St.], 246 NY 72, 76 [emphasis added]; see, Kamhi v Town of Yorktown, 74 NY2d 423, 428, supra; Baldwin v City of Buffalo, 6 NY2d 168, 173, supra).
Chief Judge Wachtler and Judges Simons, Kaye and Bellacosa concur in Per Curiam opinion; Judge Hancock, Jr., dissents and votes to reverse in a separate opinion in which Judge Alexander concurs; Judge Titone taking no part.
Order affirmed, with costs.

. Chapter 773 of the Laws of 1989 was amended by chapter 17 of the Laws of 1990. Unless otherwise noted the statute in its present amended form will be referred to simply as chapter 773.

. The Appellate Division majority in affirming the holding of Supreme Court that the measure does not violate article IX, §2 (b) (2) expressly rejected the view of the concurrers that the statute is "purely advisory in nature” (158 AD2d, at 172).

. The Assembly memorandum in support of the bill notes the impetus behind the bill was the change in New York City government, which diluted Staten Island’s voice in municipal affairs, resulting from Morris v Board of Estimate (707 F2d 686, affd 489 US 688). Thus the bill was introduced:
"as one of a series of bills seeking to separate the Borough of Staten Island from the City of New York. All the bills establish the County of Richmond as a New York State county separate and distinct from New York City, with its own local governing unit.”
(Sponsor’s [Senator Marchi, Assemblywoman Connelly] Mem in support, Bill Jacket, L 1989, ch 773, at 1; see also, Revised Mem in support by Senators Marchi and Connor, Assembly members Connelly, Vitaliano and Straniere, id.).

. The 1964 amendment added a new provision (NY Const, art IX, § 3 [c]) which expressly repudiated the prevailing rule (Dillon’s rule) mandating strict judicial construction of the municipal home rule provision (art IX, § 2 [b] [2]). That amendment also established a "bill of rights for local governments” which included an annexation provision recognizing that the residents of a municipality affected by a boundary change have both a compelling interest in any process by which boundary changes do occur, and a fundamental right to participate in that process (see, NY Const, art IX, § 1 [d]).